## UNITED STATES DISTRICT COURT
## DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. |
| v. | ) | |
| | ) | |
| UNIVERSITY OF NEBRASKA AT | ) | |
| KEARNEY; BOARD OF REGENTS OF | ) | |
| THE UNIVERSITY OF NEBRASKA; | ) | |
| DAVID L. BRANDT; CHERYL | ) | |
| BRESSINGTON; CHRISTY HORN; and | ) | |
| GAIL ZELLER, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT AND REQUEST FOR JURY TRIAL

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1.      This action is brought by the United States to enforce Title VIII of the Civil

Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("Fair Housing

Act"), 42 U.S.C. §§ 3601-3631.  It is brought on behalf of Brittany Hamilton, pursuant to 42

U.S.C. § 3612(o), as well as 42 U.S.C. § 3614(a).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345, 42

U.S.C. § 3612(o) and 42 U.S.C. § 3614(a).

3.      Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

part of the events or omissions giving rise to the United States' claims occurred there.

## THE SUBJECT PROPERTY

4.      University Heights is located at 1701 W. 35th Street, Kearney, Nebraska 68849, which is about one mile northwest of the campus of the University of Nebraska at Kearney ("UNK").  University Heights offers "apartment-style housing" for single parents, married students and students twenty-one years of age or older, and consists of 102 units of one-bedroom and efficiency apartments.

5.      Students sign leases for University Heights for at least one semester, which lasts approximately three to four months, but may sign leases that last longer periods of time.

6.      University Heights apartments are unfurnished except for a stove and refrigerator, and students are responsible for providing their own furniture.  Students and their families renting University Heights apartments are responsible for cleaning and maintaining their apartments.

7.      UNK refers to students living at University Heights as "lessees" and encourages students living in university housing to "make your new residence feel like home."   UNK assigns each household residing at University Heights an individual mailbox, and UNK instructs students to have their mail addressed as follows: "University Heights, 1701 W. 35th St., Apt. # [corresponding to room number]."

8.      University Heights is a dwelling within the meaning of 42 U.S.C. § 3602(b).

## PARTIES

9.      Defendant University of Nebraska at Kearney is a four-year university in the University of Nebraska system, where students can participate in over 170 academic programs. UNK, through its Office of Residential and Greek Life, manages University Heights.

2

10.     Defendant Board of Regents of the University of Nebraska ("the Board") has authority over general supervision over all elements of the University of Nebraska and for general operating policies of the University of Nebraska.  The Board owns University Heights.

11.     Defendant David L. Brandt is and at all relevant times has been the Assistant Director of Academic Success of the Learning Strategies Office at UNK.  At all relevant times, the Learning Strategies Office includes the Disabilities Services Office (DSO).

12.     Defendant Cheryl Bressington is and at all relevant times has been UNK's Affirmative Action/EEO/ADA/Title IX Coordinator and Human Resources Director.

13.     Defendant Christy Horn, Ph.D, is and at relevant times has been the designated ADA/Section 504 Compliance Officer at UNK.  As the ADA/Section 504 Compliance Officer, Defendant Horn decides any appeals from the decisions related to reasonable accommodations for people with disabilities at UNK.

14.     Defendant Gail Zeller, Ph.D, is and at all relevant times has been UNK's Interim Director of Academic Success and Interim Director of Residential and Greek Life.  Defendant Zeller is Defendant Brandt's supervisor in the Disabilities Services Office.  As the Interim Director of Residential and Greek Life, she is also responsible for supervising and monitoring policies for Greek and residential life and acts as the final appeal "for all contractual and disciplinary processes" of the Office of Residential and Greek Life.

15.     At all relevant times, Ms. Hamilton is and has been disabled as defined by the Fair Housing Act, as amended, 42 U.S.C. § 3602(h).  She has, and continues to have, depression and anxiety.  Her anxiety substantially impairs her ability to sleep and causes anxiety attacks, which substantially impair her ability to breathe.

16.     Defendants Brandt, Horn, Bressington, and Zeller ("Individual Defendants") were

3

responsible for denying Ms. Hamilton's reasonable accommodation requests to live with an emotional assistance animal at University Heights.

17.     Individual Defendants are and at all relevant times have been employees and agents of UNK and the Board.

## **FACTUAL ALLEGATIONS**

### I.     **UNK's Pet Policy**

18.     According to UNK's written policies, students living in university housing are not permitted to have pets other than fish.  Two exceptions to this no-pets policy exist.  First, "students with a disability who require the use of a service animal" may live with a service animal, subject to Defendants' approval of a reasonable accommodation request.  Second, "Hall Directors," who are graduate students who serve as staff members and live in University housing, may reside with cats or small dogs as pets, subject to approval by the Residential and Greek Life leadership team.

19.     UNK does not maintain a written policy specifically addressing accommodations for students with disabilities to live with service animals under the Fair Housing Act.  However, UNK's ADA [Americans with Disabilities Act] Policy for Service Animals states that "[t]herapy animals are not considered service animals."

20.     Defendants have repeatedly stated that only students with dogs trained and certified as service animals under the ADA will be granted a reasonable accommodation to live with their dog at university housing.  Defendants have repeatedly indicated that students with disabilities who seek to live with emotional assistance animals in university housing do not need to be accommodated and have referred to emotional assistance animals as "pets."

**II.      Defendants' Policies and Procedures Regarding Reasonable Accommodations**

21.      Several different offices and employees at UNK have the authority to decide

reasonable accommodation requests.  First, the Disability Services Office has the authority to

grant or deny students' reasonable accommodation requests.  Second, UNK's ADA Coordinator,

who is currently Defendant Bressington, is authorized to review reasonable accommodation

requests from any individual, including students, seeking an accommodation at UNK.  She is

responsible for forwarding reasonable accommodation requests to "appropriate staff member(s)

for review."  Defendant Bressington and the staff to whom she forwards the request may jointly

decide whether to grant or deny a student's reasonable accommodation request.

22.      The Disability Services Office maintains "Psychological Documentation

Guidelines" (hereinafter, "PDG"), which outlines UNK's requirements to "validate a

psychological impairment, its impact on the individuals [sic] educational performance and the

need for accommodations."

23.      Under the PDG, "[t]he provision of all reasonable accommodations and services

is based upon the assessment of the current impact of the disability on academic functioning."

24.      The PDG applies to students seeking an accommodation for "a psychological

impairment" and impose numerous onerous documentation requirements on such students.

25.      Specifically, the PDG requires a professional to provide an evaluation of a student

with a psychological or emotional disability that includes numerous requirements, including but

not limited to: (1) documentation of a diagnosis based on Diagnostic and Statistical Manual of

Mental Disorders, Fourth Edition (DSM-IV) Criteria; this diagnosis must describe "the nature,

frequency, and severity of the symptoms upon which the diagnosis is predicated;" (2) the

evaluation must be provided by a professional qualified to make the DSM-IV diagnosis, and the

evaluator must provide his or her "professional credentials," including "information about licensure and/or specialization;" (3) information regarding the "student's treatment and prescribed medications;" (4) "the date of the student's last visit with this provider [and] the schedule of the student's regular meeting with the provider;" (5) "[a] list of prescribed medications, dosages, and schedules [of medications];" (6) a list of any other providers who are providing treatment; (7) a clinical summary which indicates the substantial life activities impaired by the disability, "describes the extent to which these limitations would impact the academic or living environment in a postsecondary setting," and "provides clear evidence that the student's symptoms are present in two or more settings;" and (8) an explanation of how the student's functional limitations affect "the activities that are required in an academic environment."

26.     Other than requiring documentation of a physical disability from a licensed professional, Defendants do not require students with physical disabilities to provide the information required of students with psychological disabilities under the PDG.

27.     If Defendants do not believe that the documentation provided by a student's provider is sufficient, Defendants also have the authority to require a student to undergo additional testing or evaluation from a licensed professional at the student's cost to document the extent of his or her disability.  In addition, "[i]f the University determines that a second professional opinion is warranted," Defendants may require a student to undergo an independent medical exam by a licensed professional other than the student's own provider.  Defendants' policy does not contain any standards governing when Defendants may require a student seeking a reasonable accommodation for a disability to get a second professional opinion about the existence or extent of his or her disability.

III.     **Defendants' Denial of Ms. Hamilton's Reasonable Accommodation Request**

28.     Ms. Hamilton began treatment for depression in or around June 2008 and for anxiety in or around June 2009.  She has been treated by Dr. Ziah Zawaideh and Jill Phelps, an Advanced Practice Registered Nurse (APRN) who works for a medical practice in Omaha, Nebraska.  Ms. Hamilton's anxiety became disabling in or around June 2009.  Ms. Hamilton has been prescribed medications for her depression and anxiety.

29.     In or around June 2009, APRN Phelps prescribed a therapy dog for Ms. Hamilton.

30.     In or around 2009, Ms. Hamilton acquired a four-pound miniature pinscher named Butch.

31.     Tammy Hamilton-Iverson, Ms. Hamilton's mother, and her husband trained Butch to respond to Ms. Hamilton's anxiety attacks.  When Ms. Hamilton has an anxiety attack, Butch is trained to place his front paws on her shoulders, which helps Ms. Hamilton concentrate and distracts her from the anxiety.

32.     Ms. Hamilton enrolled to attend UNK for the Fall Semester of 2010.

33.     Ms. Hamilton signed a lease to live at University Heights from August 12, 2010 through May 7, 2011.  Ms. Hamilton had no alternative housing options in or around Kearney.

34.     Ms. Hamilton made three reasonable accommodation requests to live with Butch, her emotional assistance animal, at University Heights because of her disability.  She made her first request verbally, in or around April 2010, to Defendant Brandt during a pre-enrollment campus visit.  At that time, Defendant Brandt indicated that she could not live in the university dormitories with a dog but that, subject to approval of her accommodation request, she could live at University Heights.  She made her second request in writing on or around September 3, 2010. She made a third request in writing on or around September 15, 2010.

7

35.     Defendants were aware that Ms. Hamilton had been diagnosed with anxiety, and Defendants knew or should have known that her anxiety impaired her ability to sleep and to breathe.  Defendants were also aware that Ms. Hamilton only sought to live with her emotional assistance animal; she made clear that she would leave the dog in her apartment and would not need to bring the dog to campus.

36.     Defendants denied each of these reasonable accommodation requests based solely on Defendants' refusal to accommodate emotional assistance animals in university housing. Defendants stated that her accommodation request would be granted only if Ms. Hamilton could provide documentation from her doctor that Butch had been trained and certified as a service animal as defined by the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* ("ADA")

37.     Before and after moving to University Heights, Ms. Hamilton asked her medical provider to send documentation to UNK in support of her accommodation request.  APRN Phelps sent letters on August 10, 2010 and September 13, 2010.  In both letters, APRN Phelps confirmed that Ms. Hamilton was under her care for anxiety and that Ms. Hamilton would benefit from living with an emotional assistance animal.  In the first letter, APRN Phelps stated that she believed that the dog may help with her anxiety by giving her "a sense of stability," "build her confidence," and "distraction from her anxiety."  Ms. Phelps further stated that "[m]ultiple studies have shown that petting or stroking a pet can have positive effects emotionally."  In the second letter, she opined that an emotional assistance animal "would be an excellent adjuvant therapy to her medications for anxiety treatment" and reiterated that "[s]tudies have shown the positive effects of caring for a dog," including "distracting the individual" from her anxiety.  APRN Phelps provided her telephone number and stated in both letters that she

would make herself available to answer any questions that Defendants had about Ms. Hamilton's reasonable accommodations request.

38.     On or about August 19, 2010, Defendant Brandt met with Ms. Hamilton to discuss her request for an accommodation.  During that meeting, Defendant Brandt informed Ms. Hamilton that she should seek counseling at UNK's Counseling and Health Care and that Counseling and Health Care could assist her in gathering any information necessary to evaluate her accommodation request.

39.     At and following this meeting, Ms. Hamilton repeatedly stated that she was willing to provide any information she could or take any steps necessary to document her disability and need to live with her emotional assistance animal.

40.     Ms. Hamilton requested that APRN Phelps contact Defendant Brandt to provide any additional information he might need to evaluate her request.  On or about August 20, 2010, APRN Phelps called Defendant Brandt.  Defendant Brandt informed Ms. Phelps that only a certified service animal would qualify as an accommodation.  She informed Defendant Brandt that she did not know whether the dog had been certified.  Defendant Brandt only asked Ms. Phelps whether the dog had any certifications or training as a service animal; he did not ask any questions related to Ms. Hamilton's disability or need for an emotional assistance animal.

41.     At Defendant Brandt's behest, Ms. Hamilton went to at least two counseling sessions at UNK's Counseling and Health Care.  Ms. Hamilton met with Linda Shaw, a licensed counselor, on or about August 27 and September 2, 2010.  During these sessions, Ms. Hamilton described the symptoms of her anxiety and informed Ms. Shaw that she had difficulty breathing during anxiety attacks and that the anxiety affected her ability to sleep.  She also informed Ms. Shaw that her emotional assistance animal helped alleviate the anxiety.

9

42.      Defendant Brandt knew that Ms. Hamilton went to see Ms. Shaw for counseling.

43.      Ms. Hamilton also signed two medical releases.  The first release permitted APRN Phelps' office to release her full medical records to UNK's Counseling and Health Care. The second release permitted UNK's Counseling and Health Care to release any "Written/Verbal Information" in her medical file to Defendant Brandt.

44.      On or about August 31, 2010, Ms. Hamilton's complete medical records were sent to UNK.  Her medical file confirms that Ms. Hamilton received treatment and medication for depression starting in 2008 and anxiety starting in June 2009.

45.      On or about August 31, 2010, Ms. Hamilton sent an email to Defendant Brandt, urgently informing him that without her emotional assistance animal, she was having difficulty sleeping and that "it is really cutting into my classes and school work."  Ms. Hamilton reiterated her willingness to provide any information that Defendants felt they needed to grant her request.

46.      Defendant Brandt responded to Ms. Hamilton's email message later that day, stating "[i]f you are able to provide the necessary certification for your dog it will not be a problem to allow it on campus."

47.      On or about September 2, 2010, Ms. Hamilton's mother, Tammy Hamilton Iverson, called Defendant Brandt to discuss Ms. Hamilton's request.  Defendant Brandt informed Ms. Iverson that Defendants would not grant the reasonable accommodation request unless the dog was certified as a service animal.  During this or the multiple subsequent conversations she had with Defendants Brandt or Bressington, Ms. Iverson explained that she was not aware of any training certification program for emotional support animals, but that she and her husband had trained the dog to sense when Ms. Hamilton is having an anxiety attack and to help calm her by, for example, placing his paws on her shoulders.

10

48.     On September 3, 2010, Ms. Hamilton submitted a formal, written request seeking an accommodation to live with her emotional assistance animal at University Heights.  In this request, Ms. Hamilton stated that she had provided documentation from "both my regular physician and the counseling services you recommended."

49.     Defendants Brandt, Zeller, Bressington and Horn reviewed Ms. Hamilton's September 3, 2010 request and denied the request because her dog was not certified as a trained service animal.  In evaluating her request, Defendants Brandt, Bressington, and Horn referred to this emotional assistance animal as a "pet."

50.     Defendant Horn, for example, emailed Defendant Bressington, on or about September 8, 2010, stating that Ms. Hamilton's reasonable accommodations request should be denied because "[t]his is not a service animal but rather a pet."  Defendant Horn continued: "[U]nless this animal can be classified as a service animal, we are opening a big can of worms. In essence, anyone can have their doctor say they are anxious and need to have their dog, cat, snake, or monkey, etc."

51.     On or about September 15, 2010, Defendant Brandt met with Ms. Hamilton and informed her that her accommodations request had been denied.  He later sent her an email summarizing the meeting and presenting her with two options.  Her first option was to discontinue living with her emotional assistance animal, adding that in doing so, she "will have chosen to go beyond what Butch is able to provide for you and to grow toward more independence."  Defendant Brandt indicated that to that end, Ms. Hamilton could use the services of UNK Counseling and Health Care "to begin to overcome some of the issues you deal with concerning your anxiety."  Defendant Brandt stated that the second option was to continue to live with Butch but would require her to get "out of the housing contract" and move to non-

11

student housing, an option he acknowledged Ms. Hamilton had already informed him she could not afford.

52.     Later that day, Ms. Hamilton's mother sent a second accommodation request to UNK, specifically making the request for "accommodation of her assistance animal per the Fair Housing Act." She attached a copy of the Joint Statement of the Department of Housing and Urban Development and the Department of Justice, *Reasonable Accommodations under the Fair Housing Act* (May 17, 2004).

53.     Two days later, on or about September 17, 2010, Mr. Brandt emailed Ms. Hamilton stating that "[a]fter reviewing your documentation once more . . . I have found that it seems we have been looking at the requested accommodation and have yet to acquire the necessary documentation of a disability" required by UNK's PDG. Defendants Bressington and Zeller were copied on this email.

54.     Defendant Brandt acknowledged that APRN Phelps qualified as an evaluator for the purposes of the PDG, but stated that APRN Phelps must provide all of the other information required by the PDG. This email is the first written correspondence from any Defendant to Ms. Hamilton suggesting that Defendants did not have sufficient information about her disability.

55.     Despite Ms. Hamilton's having signed releases providing Defendant Brandt full access to any written or verbal information from her medical files from UNK's Counseling and Health Care, and despite having directed Ms. Hamilton to counseling sessions at UNK's Counseling and Health Care and being aware that she had met with Ms. Shaw for counseling sessions, Defendants never asked Ms. Shaw for her opinions about Ms. Hamilton's request or whether her medical file provided additional information relevant to Ms. Hamilton's request to live with the emotional assistance dog.

56.     Nor did any Defendant make any effort to contact APRN Phelps to inquire about Ms. Hamilton's disability, her need for an emotional assistance animal, or any other information listed in the PDG.

57.     Five days later, on or about September 23, 2010, Defendants Bressington, Zeller, and Brandt again denied Ms. Hamilton's reasonable accommodations request.  Defendant Bressington emailed Ms. Hamilton to inform her of the decision, stating that "I am letting you know that you cannot continue to have the dog in the Residence Hall."  Defendants Brandt and Zeller were copied on this email.  Defendants did not mention any deficiencies in the documentation of Ms. Hamilton's disability or need for the dog in their denial of her accommodations request.

58.     Instead, Defendant Bressington asserted that UNK is not required to comply with the Fair Housing Act and is only required to comply with the Americans with Disabilities Act. Defendant Bressington further asserted that under the "recently updated" ADA regulations, only service animals with training qualify as accommodations under the ADA.  Defendant Bressington stated that Defendants' denial of her accommodations request would be reconsidered only "[i]f you can provide documentation that your dog has been trained to provide assistance and documentation of what that assistance is from a doctor."

59.     Defendants knew or should have known that Ms. Hamilton had no documentation for Butch's training based on previous conversations with Ms. Hamilton, APRN Phelps and Ms. Iverson.

60.     The Department of Justice published revisions to regulations for Title II and Title III of the ADA on September 15, 2010.  In announcing these revised regulations, the Department of Justice made clear that "emotional support animals that do not qualify as service animals

13

under the [ADA] regulation may nevertheless qualify as permitted reasonable accommodations for persons with disabilities under the [Fair Housing Act]," and that public entities operating housing facilities "may not use the ADA definition of service animal as a justification for reducing their [Fair Housing Act] obligations." *Nondiscrimination on the Basis of Disability in State and Local Government Servs.*, 75 Fed. Reg. 56164, 56166 (Sept. 15, 2010). The Department of Justice emphasized that "particularly in the context of residential settings," "there may be a legal obligation to permit the use of animals that do not qualify as service animals under the ADA, but nonetheless provides necessary emotional support to persons with disabilities."

61.     The ADA regulations also state unambiguously that a public entity "shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal." 28 C.F.R. § 35.136(f).

62.     Because Defendants refused her request to live with her emotional assistance animal at University Heights, Ms. Hamilton withdrew from classes at UNK on or about October 14, 2010 and ultimately moved out of University Heights on or about October 28, 2010.

63.     A few weeks after denying Ms. Hamilton's reasonable accommodations request, Defendants denied another student's request for a reasonable accommodation to live with an emotional support dog at University Heights. Defendant Brandt expressly informed the student that UNK considers untrained emotional assistance animals to be pets and that an accommodation would be granted only if she could find a dog that was trained to provide a service, such as a trained guide dog for people who are blind.

64.     Ms. Hamilton timely filed a complaint of discrimination with the U.S. Department of Housing and Urban Development ("HUD"), pursuant to 42 U.S.C. § 3610(a).

65.     Pursuant to 42 U.S.C. § 3610(a) and (b), the Secretary of HUD investigated this complaint, attempted conciliation without success, and prepared a final investigative report. Based on the information gathered in the course of this investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g), determined that reasonable cause existed to believe that Defendants violated the Fair Housing Act.  Accordingly, on September 30, 2011, pursuant to 42 U.S.C. § 3610(g)(2)(A), the Secretary issued a Determination of Reasonable Cause and Charge of Discrimination against Defendants.

66.     On or about October 24, 2011, Defendants timely elected to have these charges resolved in a federal civil action, pursuant to 42 U.S.C. § 3612(a).

67.     The Secretary of HUD subsequently authorized the Attorney General to file this action on behalf of Ms. Hamilton, pursuant to 42 U.S.C. § 3612(o).

## FIRST CLAIM FOR RELIEF

68.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1-67, *supra*.

69.     By the actions and statements referred to in the foregoing paragraphs, Defendants have:

(a)     Refused to rent, refused to negotiate for the rental for, or otherwise made unavailable or denied, a dwelling because of disability, in violation of 42 U.S.C. § 3604(f)(1)(A);

(b)     Discriminated in the terms, conditions or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of disability, in violation of 42 U.S.C. § 3604(f)(2);

15

(c)     Discriminated in the terms, conditions or privileges of the rental of a dwelling, or in the provision of services or facilities in connection therewith, on the basis of disability, by refusing to make reasonable accommodations in rules, policies, practices or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling, in violation of 42 U.S.C. § 3604(f)(2), (f)(3)(B).

70.     By the actions and statements referred to in the foregoing paragraphs, Defendants UNK, the Board, Brandt, Bressington, and Horn have made, printed or published, or have caused to be made, printed, or published, statements with respect to the rental of a dwelling that indicated a preference, limitation or discrimination based on disability, in violation of 42 U.S.C. § 3604(c).

71.     As a result of Defendants' conduct, Brittany Hamilton has been injured and is an aggrieved person as defined by 42 U.S.C. § 3602(i).

72.     Defendants' conduct described herein was intentional, willful, and taken in reckless disregard for Ms. Hamilton's rights.

## SECOND CLAIM FOR RELIEF

73.     Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1-72, *supra*.

74.     Defendants' actions, conduct, policies, and statements, as described above, constitute:

(a)     A pattern or practice of resistance to the full enjoyment of rights granted

by the Fair Housing Act, 42 U.S.C. §§ 3601-3631, in violation of 42

U.S.C. § 3614(a); or

(b)     A denial to a group of persons of rights granted by the Fair Housing Act,

42 U.S.C. §§ 3601-3631, which raises an issue of general public

importance, in violation of 42 U.S.C. § 3614(a).

75.     In addition to Brittany Hamilton, other persons may have been injured by

Defendants' discriminatory actions and practices as described above.  Such individuals are also

"aggrieved persons" under the Fair Housing Act, 42 U.S.C. § 3602(i).


WHEREFORE, the United States prays that this Court enter an order that:

1.   Declares that Defendants' actions, policies and practices, as alleged herein, violate the

Fair Housing Act;

2.   Enjoins Defendants, their agents, employees and successors, and all other persons in

active concert or participation with them, from:

(a)     discriminating on the basis disability in any aspect of the rental or lease of

a dwelling;

(b)     discriminating in the terms, conditions, or privileges of sale or rental of a

dwelling, or in the provision of services or facilities in connection

therewith, on the basis of disability;

(c)     stating any preference, limitation or discrimination on the basis of

disability;

17

(d)     failing or refusing to take such steps as may be necessary to restore, as nearly as practicable, Brittany Hamilton and any other aggrieved persons to the position they would have been in but for the discriminatory conduct; and

(e)     failing or refusing to take such steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' unlawful housing practices;

3.  Awards monetary damages, pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1) and 3614(d)(1)(B), to all persons harmed by Defendants' discriminatory practices; and

4.  Assesses a civil penalty against Defendants, pursuant to 42 U.S.C. § 3614(d)(1)(C), to vindicate the public interest.

The United States further prays for such additional relief as the interests of justice may require.

The United States of America hereby requests that trial of the above and foregoing action should be held in Lincoln, Nebraska, and that the case be calendared accordingly.

Dated: November 23, 2011

Respectfully submitted,

DEBORAH R. GILG
United States Attorney
  s/LAURIE A. KELLY
LAURIE A. KELLY
Assistant United States Attorney
United States Attorney's Office
District of Nebraska
1620 Dodge Street, Suite 1400
Omaha, NE 68102-1506
Phone: (402) 661-3700
Fax: (402) 661-3081
MA Bar No. 5575755

ERIC HOLDER
Attorney General

THOMAS E. PEREZ[1]
Assistant Attorney General
Civil Rights Division

  s/STEVEN H. ROSENBAUM
STEVEN H. ROSENBAUM[1]
Chief
Housing and Civil Enforcement Section

  s/MARY J. HAHN
REBECCA B. BOND[1]
Deputy Chief
MARY J. HAHN, DC Bar No. 500193
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Northwestern Building, 7th Floor
Washington, DC 20530
Phone: (202) 305-0921
Fax: (202) 514-1116


Attorneys for Plaintiff
United States of America

---

[1] Assistant Attorney General Thomas Perez, Chief of the Housing and Civil Enforcement Section Steven Rosenbaum, and Deputy Chief Rebecca Bond do not intend to receive electronic notifications in this matter.